THE BOARD OF SUPERVISORS OF BUREAU COUNTY

*v.*

THE CHICAGO, BURLINGTON & QUINCY R. R. COMPANY.

1. APPEALS — *lie from decisions made by the board of supervisors of county.* The act of 1861, allowing an appeal to be taken by a railroad company from the determinations of the board of supervisors of a county to the Circuit Court, is constitutional and valid.

2. STATUTES — *will not be held unconstitutional except in the clearest cases.* This court has repeatedly declared, that it will not pronounce a statute unconstitutional, except in a case where the violation is plain and palpable.

3. TAXATION — *must be uniform.* The rule of uniformity of taxation prescribed in the Constitution requires that one person shall not be compelled to·

pay a greater proportion of the taxes, according to the value of his property, than another.

4. So, where the property belonging to individuals in a county has been assessed at less than its actual value, the constitutional rule of uniformity forbids that the property of a railroad company in such county should be assessed upon any greater per cent of its value than that of individuals.

APPEAL from the Circuit Court of La Salle county; the Hon. MADISON E. HOLLISTER, Judge, presiding.

The facts in this case are fully presented in the opinion.

Messrs. LELAND, BLANCHARD & HERON, for the appellant.

Mr. GEORGE C. CAMPBELL, for the appellee.

Mr. JUSTICE BREESE delivered the opinion of the Court:

This cause was argued and submitted at April Term, 1866, and carefully considered with a desire to reach a conclusion which should be entirely satisfactory. After much reflection, it was thought advisable to direct a reargument of the cause, as the questions presented were of great magnitude and of great public importance. Accordingly, the case has been re-argued at this term, with consummate ability, affording us much aid in coming to the conclusions which we now announce.

The power of the legislature to impose taxes is expressly granted by the Constitution, and is found in the following provisions of that instrument. They are just, wise and simple. Section 2, article 9, requires the general assembly to provide for levying a tax by valuation, so that every person and corporation shall pay a tax in proportion to the value of his or her property; such value to be ascertained by some person or persons to be elected or appointed in such manner as the general assembly shall direct, and not otherwise. Section 5 of the same article provides, that the corporate authorities of counties, townships, school districts, cities, towns and villages

may be vested with power to assess and collect taxes for corporate purposes; such taxes to be uniform in respect to persons and property within the jurisdiction of the body imposing the same.

In the exercise of this grant of powers, several laws have been passed by the general assembly, and among them the act of February 12, 1853, relating to the assessment of property for taxation in counties adopting township organization.

The 10th section of this act provides, that " each separate parcel of property shall be valued at its true value in money, excluding the value of crops growing thereon; but the price for which such real property would sell at a forced sale, shall not be taken as a criterion of such value; and personal property of every description shall be valued at the usual selling price of similar property at the time of listing and in the county where the same may then be; and if there be no usual selling price known to the person whose duty it shall be to fix a value thereon, then at such price as it is believed could be obtained therefor in money at such time and place." Scates' Comp. 1046, 1050.

The fourth section provides, that every owner of real property shall list it in the town or district in which the property belongs, and personal property shall be listed in the town or district wherein the owner resides. Section 6 provides the mode by which this listing is effected.

It is apparent these provisions have special reference to the ordinary kinds of property which the people generally have in possession and own; therefore, by the act of February 14, 1855, a discrimination is made in regard to the property of railroad companies. They are required, by section 4, of that act, to set forth in their schedules, or lists of taxable property, a description of all the real property owned or occupied by the company in each county, town and city through which their railroad may run, and the actual value of each lot or parcel of land, including the improvements thereon (except the track or superstructure of the road), must be annexed to the description of each lot or parcel of land. This list must set forth the number

of acres taken for right of way, stations, or other purposes, from each tract of land through which the road may run, describing the land as near as practicable in accordance with the United States surveys, giving the width of the strip or parcel of land, and its length through each tract; also, the whole number of acres and the aggregate value thereof in such county, town and city. All this is denominated real property, and such list must set forth the length of the main track and the length of all side tracks and turn-outs in each county, etc., through which the road runs, with the actual value of the same, and the value of the improvements at each of the several stations, where such stations are not a part of the city or town lots. This track and these stations are denominated "fixed and stationary personal property."

This list must also contain an inventory of the rolling stock belonging to the company, with the value thereof. This rolling stock is denominated personal property. This list must also contain a statement of the value of all other personal property owned by the company, and also must state the length of the whole of the main track within the State and the total value of the rolling stock, which rolling stock is taxed in the several counties, towns and cities *pro rata*, in the proportion the length of the main track in such county, town or city bears to the whole length of the road; all other property must be listed and taxed in the county, town or city where the same is located or used. This section then proceeds to define the description of all lands owned by any railroad company for right of way or station purposes other than those which are a part of a laid off town, city or village, under which it shall be entered by the assessor in his books. Scates' Comp. 1166.

The second section provides, that this list or schedule of taxable property belonging to a railroad company shall be made to the county clerk, instead of the assessor, and the clerk is required to lay the same before the board of supervisors when they meet to equalize the assessment of property.

If a majority of this board are satisfied that the schedule is correct, they are required to assess the property according to

it; but if they believe such schedule does not contain a full and fair statement of the property of the company subject to taxation in such county, made out and valued in accordance with the requirements of the law, the board is authorized to assess, or cause it to be assessed, in accordance with the rules prescribed for assessing such property. Scates' Comp. 1105.

Bureau county, in which these proceedings originated, it is admitted, is under township organization, and the above provisions of the law are applicable to them.

The appellees, in the attempted performance of the duty enjoined on them by these statutes, presented their list, or schedule of their taxable property, for 1863, owned by them in Bureau county, to the clerk of the County Court, in all respects, as alleged by them, in strict compliance with the statute; which the clerk laid before the board of supervisors when they met to equalize the assessments in that county. This schedule presented an aggregate valuation of $282,383\frac{27}{100}$, of their property owned in Bureau county, which, by the action of the board was increased to $395,336\frac{57}{100}$, being forty per cent above the valuation by the company.

Availing of the act of 1861, by which an appeal is allowed to the Circuit Court from the action of the board of supervisors, the company took an appeal to the Circuit Court of Bureau county, and, by change of venue, the cause was transferred to La Salle county, in the Circuit Court of which county, at the March Term, 1866, such proceedings were had as resulted in a deduction by that court of the per cent thus imposed by the board of supervisors, leaving the schedule of the company as originally presented to the county clerk intact.

To reverse this judgment, the county of Bureau bring the case here by appeal, and assign various errors, which we have fully considered.

The first question they make is, that the Circuit Court had no jurisdiction of the appeal,— that it was a case not provided for by the fundamental law, and we are referred to that clause of the Constitution conferring judicial power, in support of the position. Section 1 of article 5 declares, that the

judicial power of the State shall be vested in one Supreme Court, in Circuit Courts, in County Courts and in justices of the peace. *Provided*, that inferior local courts of civil and criminal jurisdiction may be established by the general assembly in the cities of this State, but such courts should have a uniform organization and jurisdiction in such cities. By section 8 of the same article, it is provided, that there shall be two or more terms of the Circuit Court held annually in each county of this State, at such times as shall be provided by law; and said courts shall have jurisdiction in all cases at law and equity, and in all cases of appeal from all inferior courts.

It is argued with great force and ability, that, inasmuch as the board of supervisors is in no sense a court of any description, an appeal cannot lie to the Circuit Court from any of its determinations, and, consequently, the act of 1861, allowing an appeal by a railroad company from their determinations, is unconstitutional and void. Much ingenious, forcible and persuasive argument has been used by appellants here in support of this view, but we are not convinced by it. Even if we had a doubt of the power of the legislature to make this enactment, we should be constrained, under repeated rulings of this court, to solve the doubt in favor of the legislature; for this court has declared, that it is only in a very clear case, where the violation of the Constitution is plain and palpable, that we will so pronounce. *Lucas* v. *Harris*, 20 Ill. 164; *The People ex rel.* v. *The Auditor*, 30 id. 434; *City of Chicago* v. *Larned*, 34 id. 203.

In considering the legislation of this State of a character analogous to this act of 1861, we are by no means convinced of the want of power in the legislature to allow this appeal. It may be the board of supervisors of a county is not a court in the legal acceptation of that term, but it has power conferred upon it, by the wanton and unjust exercise of which the most vital interests of parties before it may be rendered totally valueless. Perilous indeed would be their condition, if those great interests were at the mercy of irresponsible men, bent, it may be, on inflicting injury for which they could not

atone.  It is going a great way to say, that any act of the legislature — a co-ordinate department of the government, and whose speciality is the enactment of laws — that any one of their enactments has no foundation in the Constitution,— an instrument which the law makers are sworn to support, and which we must not suppose they have violated, in the absence of the clearest proof.  Hence, courts have always approached this subject with great delicacy, and have ever manifested a disposition to sustain the law, in the absence of an entire conviction of its unconstitutionality.  This much of respect is certainly due to that department of the government, and this court has always most cheerfully extended it, and ever will.

To insist that a board of supervisors is not a court, does not decide the question, as we think.  In our legislation, several acts may be found, giving an appeal to the Circuit Court in cases confessedly not originating in the exercise of judicial power by a court.  As for example, in the case of the trial of the right of property by a sheriff's jury.  The case of *Rowe* v. *Bowen*, 28 Ill. 118, was such a case, in which we held, that an appeal lies in many cases not growing out of judicial proceedings, as upon assessments of damages by commissioners for roads, or for city improvements.  So, also, in the case of the establishment of a road by commissioners, as was held in the case of *The County of Peoria* v. *Harvey*, 18 id. 364.  So, where the statute gives an appeal from an assessment of damages for a right of way.  *Joliet & Chicago R. R. Co.* v. *Barrows*, 24 id. 562; the case of the *Ohio and Mississippi R. R. Co.* v. *The County of Lawrence*, 27 Ill. 71, occurring before 1861, very distinctly intimates that legislative action was necessary to uphold the appeal, and if that existed, the right to appeal was free from doubt.  The act of 1861 gives an appeal in express terms.  In view of this legislation, and these judicial decisions, it is too late to urge a want of jurisdiction in the Circuit Court to try the appeal from the board of supervisors, and we must hold, that the jurisdiction was complete under the act of 1861, and that statute is not in conflict with any provision of the Constitution, considered in the light of long continued analo-

gous legislation under it. In counties not adopting township organization, individual tax payers had an appeal from the county assessor to the County Court, and from that court, through the auditor of public accounts, to the Supreme Court. Scates' Comp. 1040. Railroad companies are entitled to as much favor in this regard as individuals, and we have no difficulty in deciding the Circuit Court had full jurisdiction of the appeal.

Having disposed of this preliminary question, the other points arising in the case may be grouped into the consideration of the instructions given for appellees, and which is the most important error assigned.

For the appellees, the court instructed the jury, if the company valued their property in their schedule or return, so that it bore a just relation to other property in the county, then the board of supervisors had no power to increase the valuation, and they should find for the company; and, further, if the jury believed that the addition of forty per cent to the aggregate valuation returned by the company so increased the valuation that it bore an undue proportion of the taxes of the county, then such increase was unwarranted by law, and the jury would be authorized to reduce the assessment, so that it would bear a proper proportion to such taxes, but they could not reduce it below the valuation fixed upon it by the company. Appellants asked instructions directly opposite to those given for appellees, which were refused by the court.

The instructions so given announce principles so congenial to justice, and so consonant with the principles of equity, and so reasonable, as to challenge the approbation of all right-minded men, and they ought to be sustained if they are in accordance with the law under which the proceedings were had. This, then, becomes the main point of inquiry.

It is insisted by appellees, that their property, by this addition of forty per cent on its valuation, as returned by them to the county clerk, placed on it by the board of supervisors, has the effect to cause them to pay a greater proportion of the revenue than is demanded of individuals listing their property

for taxation in the same county. If this be so, no just mind, with the Constitution of the State before him, could sanction the proceeding. The great central and dominant idea in that instrument is, uniformity of taxation; and no power exists, or should exist, in any corporate authority to go counter to this command of the fundamental law. A mode has been furnished by law by which this uniformity shall be attained; and that is, that property shall be assessed at its actual value, and the rate of taxation placed upon it shall be the same regardless of persons or ownership. Persons are elected to ascertain this value, and the rate is prescribed.

It sufficiently appears, that the schedule returned by the appellees to the clerk of the County Court, fixed the value of the property owned by them in Bureau county on the same, or on a more liberal basis, than the several assessors in the various towns fixed upon the property of individuals in the same county, though in neither case was the property valued at any thing near its actual cash value. For instance, while the valuation of the property of individuals ranged from one-fifth to one-third of its cash value, that of the appellees ranged from one-third to one-half of its actual value.

The requirements of the law, that each separate parcel of property shall be valued at its true value in money, though simple as a proposition, is not always easy to obey; nor is that requiring personal property to be valued at the usual selling price of similar property at the time of listing. So many elements enter into the price of an article, even one in common use, that it is difficult to put a selling price upon it. Upon railroad property it is still more difficult, as their personal property has no market value. Their property is *sui generis,* not affected by the principles of supply and demand, and is, for the most part, unsalable except in emergencies, when competing lines may need rolling stock or other portions of their equipments. It cannot be affirmed of a railroad in running condition, that its properties are marketable. What they cost is no evidence of their real value; nor do we know of any means an assessor or a board of supervisors may have at command by

which to determine precisely the true value of their most valuable property. Their lands can be valued with the same, but with no greater facility than similar property of individuals; but the value of their track, and superstructure, and rolling stock depends so much on contingencies that it seems almost impossible to fix its real value. But, assuming the values to be as fixed by the witnesses examined on this point, the return made by appellees shows that the valuation they fixed upon it, was from one-third to one-half of its appraised value. But we do not intend to go into the *minutiæ*, but to announce simply the principles we recognize as legal and just, which should govern the whole subject. The question is before us in all its length and breadth: Can a railroad company, by any action of the corporate authorities of a county, be required to pay more than its fair share of taxes as compared with those paid by individuals? Does the power exist anywhere to destroy the cardinal principle of uniformity of taxation so forcibly and prominently insisted upon by the Constitution? This is a great question, affecting, not only railroad corporations, but every property owner and tax payer in the State.

It seems to us there is something so monstrous in the proposition as to be indefensible by fair argument.

Regarding uniformity as the vital principle, the dominant idea of the Constitution, where can the power reside to produce its opposite? Where is the power lodged, in view of this principle, to compel A to pay, on his land or personal property, of no more value than the same kind of property belonging to B, forty per cent more taxes then are assessed against B? We affirm such a power nowhere exists, and if it did it would be so revolting in its exercise to the lowest sense of justice with which our species is imbued as to justify any and every lawful expedient for relief against it.

The framers of our Constitution and our law makers, to their credit be it said, have kept steadily in view the principles of equality and justice, in adopting a system of taxation which commends itself to the favor and approbation of all well organized minds.

It is no argument to urge, that the fault is with the assessors in the case of individuals, and with railroad companies in making out their schedules for the county clerk. If the assessors violate their duty, are railroad companies to be the sufferers? If they neglect to act fully up to all the requirements of the law, is that any reason why A should pay forty per cent more taxes, in proportion to value, than B?

The rule adopted by the assessors in this State has grown into a custom, and has been tacitly sanctioned by every department of the government for a long course of years, and it is now too late to challenge it. Even so late as the last special session of the legislature, that body, by clear implication, acknowledged the custom and yielded to its influence, by the provisions of the act to tax the shares in national banks. They therein impliedly declare that such shares are to be taxed the same as other property. A share of bank stock, under that bill, is not required to pay more State or local taxes than a piece of land, or a house, of equal value; and the plain inference is, if such property be assessed on only one-third of its actual value, bank stock shall be assessed on the same per cent of its actual value. Would not the sense of justice of every man in this community be outraged by allowing this or any other depreciation to one class of people, and demanding of another a higher tax on a similar article of the same actual value? The proposition cannot commend itself to the favor of any just man, and can receive no countenance in a court of justice.

It is an admitted fact on both sides to this controversy, that the property of no one owner in the county of Bureau has been taxed on its real value, and that the per cent added by the board of supervisors to the valuation of the property of appellees imposes on them a greater proportionate burden than the law requires them to bear. We are of this opinion, and therefore consider the action of the board unfounded in justice, and in direct opposition to the Constitution. The great and attractive feature of uniformity has been disregarded by the board, and appellees victimized. It may be very desirable, that the greatest share of the public burdens shall be borne by these

corporations, but until there be a radical change in our fundamental law it cannot be done. They stand on the platform of equality before the law, and no greater burden for the support of government can be imposed upon them than can be placed on the individual tax payer.

Entertaining these views, we must affirm the judgment of the La Salle Circuit Court. The action of the board of supervisors of Bureau county was *ultra vires,* and cannot be sanctioned by this court.

*Judgment affirmed.*

WALKER, Ch. J. I concur in holding, that an appeal lies, under the Constitution and law, in this class of cases; but dissent from the rule announced in the opinion of the majority of the court, for ascertaining the value of the property in controversy for assessment for taxation.