### TAYLOR et al. v. LOUISVILLE & N. R. CO.

(Circuit Court of Appeals, Sixth Circuit. July 5, 1898.)

No. 599.

1. FEDERAL COURTS—JURISDICTION—SUIT AGAINST STATE OFFICERS.
    A suit against state officers to enjoin them from certifying a tax, which they claimed to do by authority of the state, but which complainant avers to be without lawful authority, is not a suit against the state, within the meaning of the eleventh amendment.

2. SAME—INJUNCTION AGAINST TAXATION—STATE STATUTES.
    That a state statute forbids the courts to enjoin collection of alleged illegal taxes, and restricts the remedy to an action to recover them back, does not affect the jurisdiction of a federal court, in cases of diverse citizenship, to entertain a suit to enjoin the state officers from certifying or collecting illegal taxes.

3. ENJOINING COLLECTION OF TAXES—EQUITY JURISDICTION.
    A suit to enjoin the collection of a tax will not be entertained (at least, in the federal courts) when the sole ground relied on is that the tax is illegal or excessive. It must appear in addition that the circumstances make the wrong about to be inflicted of such a peculiar character that the remedies at law are inadequate, and so bring the case under some recognized head of equity jurisdiction.

4. SAME—REMEDY BY CERTIORARI.
    It would seem that the fact that there is a remedy by certiorari in the state courts, which would prevent a multiplicity of suits in a case of ille-

gal taxation, does not affect the jurisdiction of a federal court in equity to enjoin the enforcement of the tax in cases of diverse citizenship, as the remedy by certiorari is not available in the federal courts, whose powers to issue the writ are limited to cases in which it is necessary for the exercise of their jurisdiction.

**5. SAME.**

In any event, certiorari is not an adequate remedy where the fact upon which the claim for relief is based can only be made to appear de hors the record.

**6. TAXATION—RAILROADS, TELEGRAPHS, AND TELEPHONES—TENNESSEE STATUTES.**

Act Tenn. April 5, 1897, in relation to the taxation of railroad, telephone, and telegraph property, which required the board of assessors therein provided for to complete their assessment on or before September 1st of that year, annulled by implication, and superseded, the assessment previously made for the same year by the old board of assessors under the act of 1895.

**7. SAME—RELEVANCY OF EVIDENCE—MARKET VALUE OF STOCK AND BONDS.**

In valuing railroad property for purposes of taxation, the market value of the bonds and stock of the corporation owning it may properly be considered, even if, under the statute, each line of road is to be valued by itself, and not as part of a system. .

**8. SAME—EQUALIZATION OF ASSESSMENT.**

Under the Tennessee railroad assessment act of 1897, neither the board of tax assessors nor the board of equalization are charged with the duty of equalizing the taxable value of real estate with that of railroad property.

**9. SAME—CONSTITUTIONAL LAW—EQUALITY OF TAXATION.**

Under the Tennessee constitution of 1870 (article 2, § 28), declaring that all property shall be taxed "according to its value," to be ascertained as the legislature shall direct, "so that taxes shall be equal and uniform throughout the state," when it is the uniform practice in the various counties of the state to assess real property at not exceeding 75 per cent. of its true value, an assessment upon railroad property at its full value violates the uniformity of taxation which is the main purpose of the constitutional provision, and will be enjoined, although this involves a violation of the letter of the state statute passed pursuant to the constitution, which requires all property to be assessed at its full value.

**10. SAME.**

Equity will not enjoin an assessment of property at its full value, on the ground of inequality resulting from the assessment of other property at less than its full value, unless it appears that the assessing officers, whose acts of undervaluation create the unjust burden, intentionally and habitually violate the law by assessing property at less than its true value; but it need not affirmatively appear that they did so with intent to injure complainant and his class of taxpayers.

Appeal from the Circuit Court of the United States for the Middle District of Tennessee.

The Louisville & Nashville Railroad Company—a corporation organized and existing under the laws of the state of Kentucky, and a citizen of that state—owns 519 miles of railroad in Tennessee. It filed its bill in equity in the circuit court of the United States for the Middle district of Tennessee against R. L. Taylor, W. S. Morgan, and E. B. Craig, citizens of Tennessee, who constitute a board of equalization of the state of Tennessee, to enjoin them from certifying, in accordance with the act of the legislature of Tennessee, passed April 5, 1897, a tax valuation upon complainant's railroad in Tennessee, to be apportioned by the state comptroller to the 35 counties, cities, and towns in which the road lies. Under the act of 1897, railroad, telephone, and telegraph property is assessed biennially by three members, known as "State Tax Assessors," whose assessment must be revised upon the record by another board, called the "Board of Equalization," composed of the governor, secretary of state, and treasurer. The appellate board is given the

power to examine each assessment, and increase or diminish the valuation upon any one or more of the properties assessed, so as to fix the proper value; and, until this board has acted upon the assessments, they are not deemed complete. The valuations fixed by the appellate board are certified to the comptroller, and he, in turn, certifies to the various counties and municipalities the valuation upon which taxes are to be collected by the respective counties and municipalities, the apportionment being graduated according to the mileage or value of the property assessed in each county and municipality. Under other laws of Tennessee, real and personal property of all persons, except railroad, telephone, and telegraph companies, is assessed by the taxing officers of each county. In counties having a population of 60,000 and over, one assessor for the county is elected, whose duty it is to assess all property in the county. In counties having a less population, each civil district has one assessor. Each assessor, before entering upon his duties, is required to enter into a bond in the sum of $5,000, conditioned that he shall faithfully and honestly discharge the duties of his office, and to take and subscribe an oath that he will assess property at its fair cash valuation, without fear or favor. A board of equalization is provided for each county, composed of the judge or chairman of the county court, and four freeholders, not members of the county court, and not holding any other office,—state, county, or federal. These various boards meet in their respective counties, and compare and equalize the assessments of property made in and for the particular county. If the board desires to raise the value of any taxpayer's property, it can be done, upon notice to the taxpayer. Assessments of real estate made in 1896 were made for the biennial period of 1896 and 1897. Beginning with 1898, the assessments of realty are to be made every fourth year. Personal property is assessed annually. Until 1895 no attempt had ever been made to equalize the assessments of real estate or personalty, as between the different counties; but at its session in that year the general assembly created a state board of equalizers, for the purpose of equalizing the values of real estate in the various counties. The same board was given power to assess and apportion the value of railroads throughout the state. In 1896 the board of equalizers assessed the complainant's railroad for the taxes of 1896 and 1897 as follows: The main line, at the rate of $31,000 a mile; the Nashville & Decatur division, at the rate of $21,000 a mile; the Henderson division, at the rate of $20,000 a mile; the Memphis division, at $13,500 a mile; the Cumberland Valley division, at the rate of $15,000 a mile; the Clarksville & Princeton division, at the rate of $4,000 a mile. By the act of April, 1897, the board of equalizers was abolished, and the duty of assessing railroads was imposed on a state board of tax assessors and a revisory board called the "Board of Equalization," but no power was given to the new board to equalize real estate. The board of state tax assessors made an assessment of railroads for 1897 and 1898, treating the assessment by the board of equalizers as annulled by the new law. Their valuation of complainant's main line was $65,000 per mile; of the Nashville & Decatur division was $47,000 per mile; of the Henderson division, $62,000 per mile; of the Memphis division, $27,000 per mile; of the Cumberland Valley division, $23,500 per mile; of the Clarksville & Princeton division, $5,000 per mile; and of the Clarksville & Mineral division, $7,000 per mile. The appellate board of equalization on appeal reduced the assessment on the main line from $65,000 to $60,000; on the Henderson division, from $62,000 to $55,000; on the Nashville & Decatur division, from $47,000 to $40,000 per mile,—but in other respects affirmed the action of board of assessors.

Among other grounds set forth in the bill for equitable relief against this increase in the assessment is the following averment with reference to the evidence brought out before the state tax assessors: "That the complainant also filed in its behalf before said assessors a large number of affidavits (about 155 in number) made by tax assessors, trustees, other officials, and real-estate owners, which showed that in the counties through which plaintiff's said roads ran, and in the counties through which other railroad properties assessed at the same time by said assessors ran, real estate, generally and systematically, was assessed for taxation at from fifty to seventy per cent. of its value. These affidavits varied in form, but the general tenor and result

of them, and of depositions taken and filed as evidence by plaintiff, was to establish the fact that property generally in Tennessee, other than railroad property, by assessments generally and purposely made, does not bear a burden of taxation at a greater proportion than an average of sixty per cent. of its market value; and plaintiff alleges that such is the case, and that its said properties for said years, as finally fixed by said board of equalization, were assessed at more than their full value. Recognizing the fact that throughout the state of Tennessee property had been systematically assessed, from time immemorial, at a valuation for the purpose of taxation greatly less than its actual value, and at a valuation ranging from fifty to about sixty-five per cent. thereof, the state of Tennessee, through its board of assessors and equalizers, during the years 1895 and 1896 endeavored to systematize the county assessments, and bring them up to a common standard or basis of valuation. Accordingly the said board established as the basis of assessment for taxation in all of the counties of the state seventy-five per cent. of the actual or true value of the lands or property to be assessed, and raised the assessment in the various counties of the state for both said years, where they were less than seventy-five per cent., to seventy-five per cent. Plaintiff further shows that the said board of assessors and equalizers was the first state board of equalizers in the state of Tennessee, and was a legislative recognition of the systematic usage and custom of valuation prevailing, and the legislative purpose to render it uniform throughout the state. Plaintiff further states that said board of assessors and equalizers was not only intrusted with the power of equalizing assessments throughout the state, but also with the duty of assessing railroad, telegraph, and telephone properties for taxation; and it avers and charges that the assessment made by said board, and the valuation fixed upon said properties, were made by them at the rates fixed for the purpose of equalizing the assessments of such properties with those of the lands of Tennessee. If said assessments [i. e. those against which an injunction is prayed] stand, plaintiff will be bearing, in comparison with other property assessed in the state of Tennessee, at least twenty-five per cent. more than its just proportion; and the burden of taxation thus imposed upon it will be unequal, and in contravention of the constitution of the state of Tennessee. which provides that all property shall be taxed according to its value, and so that taxes shall be equal and uniform throughout the state, and so that no one species of property from which a tax may be collected shall be taxed higher than any other species of property of the same value, and also in contravention of the constitution of the United States, which guaranties to plaintiff and its property the equal protection of the laws." The bill further avers: "In pursuance of said assessment act, said board of equalizers will, as they have informed plaintiff's counsel, unless prevented, certify at 12 m., November 30, 1897, to the comptroller, the valuations so fixed by them upon said property. The comptroller will proceed, after said assessment shall have been certified to him according to the course of law, to collect for the state the taxes so wrongfully assessed, and will certify to the several towns, cities, and counties through which said roads pass, the said assessments; and the said towns, cities, and counties will proceed, under said act, to collect the same. Under said act, said taxes so assessed in behalf of the state, counties, and cities will become a first lien upon the property from the 10th of January of the year for which they are assessed. If the said taxes are not paid as assessed, distress warrants will issue against petitioner; and, if it shall not pay the same, then the comptroller will, under said act, advertise said property, and sell the same for cash, free from the equity of redemption. and execute to the purchaser a deed or deeds. Said roads are assessed for, and taxes will be payable under said assessments to, the following counties and towns in the state of Tennessee: Counties: Sumner, Davidson, Montgomery, Houston, Benton, Fayette, Henry, Carroll, Gibson, Stewart, Crockett, Haywood, Tipton, Shelby, Robertson, Dickson, Claiborne, Campbell, Williamson, Maury, and Giles. Cities and towns: Gallatin, Nashville, Springfield, Franklin, Columbia, Pulaski, Brownsville, Memphis, Erin, McKenzie, Humboldt, Milan, Paris, Clarksville, and a number of others. If plaintiff should seek by separate suits to resist said state tax, and the several taxes for said counties and cities, it would cause a multiplicity of suits,

entailing great hardship and expense; and if it should pay said taxes, and sue to·recover them, the same result would follow. Plaintiff charges and says that the action of said board of assessors and of said board of equalizers was arbitrary, oppressive, in violation of the law, and will, if carried into effect, impose upon plaintiff a burden unjust and unequal, as between itself and other property owners throughout the state of Tennessee." The prayer of the bill was for an injunction against the defendants to prevent their certifying and delivering in any way to tĥe comptroller of Tennessee the said· assessment of the plaintiff's property so made by them, and from certifying or delivering in any way to the said comptroller the result of their action in respect of the assessment of the said properties of plaintiff for the years 1897 and 1898, or either of them, and that upon final hearing said injunction be made final, and for such further and other relief as the nature of this case may require.

The defendants filed a joint and separate answer, in which the reply to the passage already quoted from the bill was as follows: "Further answering, defendants say that complainant filed in its behalf before said assessors a large number of affidavits made by county tax assessors, trustees, other officials, real-estate owners, and others, in thirty-five counties in Tennessee, tending to show the assessed value of real estate in said counties. Said affidavits show that there was no uniformity in assessed values of real estate in the counties mentioned, but they did not show that there was any preconcert or agreement among the assessors touching the standard of value fixed upon real estate for the purpose of assessment. The valuations were not uniform. In some instances they were higher than others, and there was great irregularity and lack of uniformity in valuations. Defendants deny that the general tenor and result of said depositions and affidavits taken and filed by complainant was to establish the fact that property generally in Tennessee, other than railroad property, by assessments generally and purposely made, does not bear a burden of taxation at a greater proportion than the average of sixty per cent. of its market value. Defendants deny the statement that such is the case, and they deny that there was,· or ever has been, any custom, immemorial or otherwise, of valuing property throughout the state at less than its true value. There are ninety-six counties in the state, and there never has been, and in the nature of things could not be, any concerted, agreed, or uniform basis of valuation, different from that prescribed by law. There are seventy-nine counties in the state through which railroads run, and said affidavits are from only thirty-five counties. Defendants say the various railroad companies objecting to the assessments made by the state tax assessors actively and energetically made strenuous efforts to obtain affidavits from any possible source showing assessments have been made below cash value, but none have been produced from forty-four counties of the seventy-nine having railroads in same. It was the function and within the jurisdiction of the assessors, in the first instance, and these defendants, acting as the board of equalization, to judge of the sufficiency and probative force or value of said affidavits as evidence; and their judgment was final and conclusive, and cannot be questioned or reviewed. Defendants also deny the statement that complainant's said properties for said years, as finally fixed by said board of equalization, were assessed at more than full value. They submit that the valuation of said board, under the laws of Tennessee, as will be more fully hereinafter shown, is final and conclusive. Defendants deny that the creation of the board of equalizers of 1895 and 1896 was a legislative recognition of the systematic usage and custom of valuation prevailing, and the legislative purpose to render it uniform throughout the state; but, on the contrary, said board was created for the purpose of putting property inadequately assessed, through the favoritism or mistaken judgment of local tax authorities, upon an equality with the property fairly assessed at its cash value, as required by law, and seeing that all property within the jurisdiction of the equalizers should be assessed at a fair cash value. Defendants deny that the board of equalizers of 1895 and 1896, by any official action, record, or report, put property in Tennessee upon a basis of seventy-five per cent. of the actual cash value of the same. If such was the basis of purported equalization on the part of the members of said board, it was one by some sort of an under-

standing among said members, never put of record in any official action, and kept from record in its minutes or inclusion on its report, and, if done, was in violation of law, and unauthorized by the statute creating the board, and subversive to the main purposes for which it was created. Defendants deny that the assessments and valuations of railroad, telegraph, and telephone properties made by said board for 1895 and 1896 were made at the same rate fixed for the purpose of equalizing the assessment of such properties with those of the lands of Tennessee. Upon information given by one of the members of said board in his deposition before the state tax assessors, and which remains uncontradicted, defendants state that most of the railroad properties in the state of Tennessee were assessed and valued at less than seventy-five per cent. of their actual cash value. Defendants deny that, by the assessment made, complainant will be bearing, or is made to bear, in comparison with other property assessed in the state of Tennessee, at least twenty-five per cent. more than its just proportion. Defendants deny that said assessments violate any provision of the constitution of the state of Tennessee, or the constitution of the United States." The answer further avers that the complainant has an adequate, sufficient, and complete remedy at law furnished it by the act passed in 1873, which provides that in all cases in which an officer charged by law with the collection of revenue due the state shall institute any proceedings or take any steps for the collection of the same, and the person proceeded against shall claim the tax to be unjust or illegal, or against any clause of the statute or of the constitution of the state, he shall pay the same to the state under protest, and file a suit within thirty days thereafter for the recovery of the same against the officer, and, if he obtains judgment, then the comptroller of the state shall issue his warrant for the amount thereof. The act provides that no writ for the prevention of the collection of any revenue claimed shall in any wise issue, either in the form of an injunction or otherwise. The answer further avers that there is a remedy by certiorari for the correction of errors alleged to have been committed by the state tax assessors, and that said remedy is exclusive of all others.

A temporary restraining order ex parte was issued on the filing of the bill, and then the cause came on for hearing on motion for preliminary injunction, at which a large amount of evidence was introduced, and the case was fully argued. The district judge (Clark) presiding filed an elaborate opinion, discussing the issues presented on the bill. It is reported in 86 Fed. 168. The circuit court made the following order: "Ordered and adjudged that the writ of injunction issue in this case, restraining and enjoining the defendants, Robert L. Taylor (governor), E. B. Craig (treasurer), and W. S. Morgan (secretary of state), ex officio the board of equalization for the state of Tennessee, from certifying and delivering to the comptroller of the treasury of Tennessee the valuation fixed by them upon the property of the complainant in Tennessee for taxation for the years 1897 and 1898, as set forth and shown in the bill, and restraining and enjoining them from certifying and delivering the said assessment or any record thereof, to the said comptroller: provided, however, that the complainant shall pay to the proper officers such sum or sums of money as shall be equal to the amount or amounts of the taxes assessed against and due from said company on its said property under and according to the assessment made in 1896 for the year 1897, and shall pay the same as, and it shall be a credit on, the taxes due from the complainant on its said property for the year 1897, to go as a credit on the assessment made in 1897 for 1897, if sustained on the final hearing; otherwise to be credited as may hereafter be decreed. And it shall be paid and received without prejudice to any right of either of the parties, or the state, counties, and municipalities of this state. Such payment must be made on or before the date at which the tax for 1897 must be paid, viz. February 1, 1898; and, if not then paid, the defendants may, upon notice of such failure, apply for and obtain a dissolution of the said injunction."

Geo. W. Pickle, Atty. Gen. (James C. Bradford and Granbery Marks, of counsel), for appellants.

Dickinson & Waller and Vertrees & Vertrees, for appellee.

Before TAFT and LURTON, Circuit Judges, and SEVERENS, District Judge.

TAFT, Circuit Judge (after stating the facts, as above). The complainant below is a citizen of the state of Kentucky. The defendants are citizens of the state of Tennessee. The amount involved in the suit exceeds $2,000. The constitution and the laws of the United States confer upon circuit courts of the United States jurisdiction to hear and determine controversies in law and equity between citizens of different states in which is involved more than $2,000. There is no doubt, therefore, of the jurisdiction of the court below to hear and decide this case, unless the fact that the defendants were officers of the state of Tennessee, and were claiming to proceed under the authority of the state in the acts threatened and now enjoined, makes this a suit against the state of Tennessee. If so, then it is within the eleventh amendment of the federal constitution, which declares that the judicial power of the United States shall not extend to suits against a state. The complaint of the taxpayer in this case is that the defendants are about to execute a taxing law of the state against complainant in such a manner that, in view of the mode in which other taxing laws are executed against a large part of the taxable property of the state, the defendants will impose upon complainant an illegal burden, in violation of its right under the state constitution to pay only an equal share of the taxes in proportion to the value of its property. This is not a suit against the state. It is a suit against individuals, seeking to enjoin them from doing certain acts which they assert to be by the authority of the state, but which the complainant avers to be without lawful authority. The point has been so often decided by the supreme court of the United States that it is sufficient to refer to a few of the cases. Smyth v. Ames, 169 U. S. 518, 18 Sup. Ct. 423; Reagan v. Trust Co., 154 U. S. 362, 390, 391, 14 Sup. Ct. 1047; Pennoyer v. McConnaughy, 140 U. S. 1, 11 Sup. Ct. 699; Poindexter v. Greenhow, 114 U. S. 270, 5 Sup. Ct. 903, 962. In Cummings v. Bank, 101 U. S. 153, a decree of injunction entered by a circuit court of the United States against state officers to prevent the enforcement of a state tax law in a manner violating the constitution of the state was affirmed by the supreme court of the United States, and it was then so well settled that such a suit was not within the eleventh amendment that the court did not deem it necessary to discuss the point.

The power to tax property is the power to take from the owner that which is his, to defray the expense of the benefit and protection which he receives from the government. If the power is illegally exercised, either by the legislature or the executive, it is an invasion of private right; and, unless there is some specific limitation upon the remedy imposed by law, the injured taxpayer may resort to the courts to vindicate his right against those officers who attempt such an invasion, by any form of action which he could use against any other wrongdoers in respect of the same class of wrongs. The state may limit the remedies of the taxpayer to redress wrongs done him by the erroneous statutory construction or the unwarranted finding of fact

by administrative officers to a hearing before administrative tribunals. In tax questions, such a hearing is due process of law. Murray v. Improvement Co., 18 How. 272; Ferry v. U. S., 85 Fed. 550.[1] The state may further curtail the jurisdiction of its courts of equity to interfere by injunction with the collection of taxes alleged to be illegal by providing that no injunction shall issue in such case. The government of the United States has made such a specific limitation, and no injunction can issue to prevent the collection of taxes levied by it. Rev. St. U. S. § 3224. The only remedy of the taxpayer is to pay the money, and sue to recover it back. The state of Tennessee has made a similar provision with respect to taxes collected for its use, but not as to taxes collected for its counties and cities. City of Nashville v. Smith, 86 Tenn. 217, 6 S. W. 273. The law of the United States forbidding injunctions in federal revenue cases prevents the issuing of an injunction by any court, whether federal or state, because the constitution and laws of the United States passed in pursuance thereof are the supreme law of the land. The law of Tennessee, however, affects only the jurisdiction of its own courts of equity. It does not restrict or diminish the power or jurisdiction of federal courts of equity, because only an act of congress can do that. In re Tyler, 149 U. S. 164, 13 Sup. Ct. 785; Mississippi Mills v. Cohn, 150 U. S. 202, 14 Sup. Ct. 75; Kirby v. Railway Co., 120 U. S. 130, 7 Sup. Ct. 430; Furnace Co. v. Witherow, 149 U. S. 574, 13 Sup. Ct. 936. Hence it follows that if the controversy at bar is one over which the circuit court of the United States, sitting in equity, from which this appeal has been taken, has jurisdiction by virtue of the constitution and laws of the United States, and according to the general principles governing equity jurisdiction, its power to issue an injunction against state officers is not restricted by a state statute which only applies, and can only apply, to injunctions issued out of state courts.

We have seen that the circuit court has jurisdiction over the cause, because it is a suit between citizens of different states. It only remains to inquire whether any ground exists for invoking the action of a court of equity. It is well settled that a suit to enjoin the collection of a tax will not be entertained in courts of equity,—at least, in those of the United States,—in which the sole ground set forth in the bill is that the tax is illegal or excessive. It must appear in addition that the circumstances makes the wrong about to be inflicted of such a peculiar character that the remedies in a court of law are inadequate, and so bring the case under some recognized head of equity jurisdiction. Ogden City v. Armstrong, 168 U. S. 224, 236, 18 Sup. Ct. 98; Express Co. v. Seibert, 142 U. S. 339, 12 Sup. Ct. 250; Allen v. Car Co., 139 U. S. 658, 661, 11 Sup. Ct. 682; Shelton v. Platt, 139 U. S. 591, 11 Sup. Ct. 646; Railway Co. v. Cheyenne, 113 U. S. 516, 525, 5 Sup. Ct. 601; Hannewinkle v. Georgetown, 15 Wall. 547; Dows v. City of Chicago, 11 Wall. 108. It appears from the bill that, if the assessment made by the defendants in this case is allowed to be certified down to the various counties and cities who are to collect the tax, the complainant, in order to vindicate its rights in a suit at law, will have to bring at least 35 different suits at law. Courts of equity frequently interfere to prevent a multiplicity of suits at law. It is a

[1] 29 C. C. A. 345.

well-recognized head of equity jurisdiction. In Sanford v. Poe, 37 U. S. App. 378, 16 C. C. A. 305, and 69 Fed. 546, this court sustained the equity jurisdiction of the circuit court to enjoin a state board for the assessment of telegraph and express companies from certifying the assessment to a large number of counties, on the ground that by the exercise of such jurisdiction a multiplicity of suits at law would be prevented, and the questions at issue could all be settled in one suit. In many cases in which the question of the equitable jurisdiction to enjoin a tax is considered by the supreme court of the United States, the prevention of a multiplicity of suits is specifically mentioned as a sufficient reason for its exercise. Dows v. City of Chicago, 11 Wall. 108; Shelton v. Platt, 139 U. S. 591, 11 Sup. Ct. 646; Express Co. v. Seibert, 142 U. S. 339, 12 Sup. Ct. 250.

Another ground for equitable relief is that the excessive tax, if not paid, will be a cloud upon the title of the complainant, for the taxes assessed are a lien upon its property in Tennesseee. The tax is not void, and the alleged illegal excess does not appear upon the record. It creates such an apparently valid incumbrance that a court of equity will interfere to remove it as a cloud, if in fact it is illegal. Ogden City v. Armstrong, 168 U. S. 224, 238, 18 Sup. Ct. 98.

It is argued on behalf of the defendants that there is an adequate remedy at law, which will prevent a multiplicity of suits, and that is by certiorari in the state courts. Such a proceeding is in its nature supervisory and appellate. Circuit courts of the United States are limited in their use of the writ of certiorari to those cases in which it is necessary for the exercise of their jurisdiction. Rev. St. U. S. § 716. Ex parte Vallandigham, 1 Wall. 243. In other words, the writ can only be used as ancillary to some other jurisdiction conferred by law; and, as no supervisory or appellate jurisdiction has been conferred upon circuit courts of the United States to revise the proceedings of special tax tribunals, it would seem clear that the circuit court below could not, on its law side, have furnished a remedy by certiorari to modify the assessments made by the defendants. The ordinary rule is that statutory remedies at law furnished by a state in its own courts will not oust the equitable jurisdiction of the federal courts of equity. This has been laid down with emphatic clearness by Mr. Justice Harlan, speaking for the supreme court, in Smyth v. Ames, 169 U. S. 466, 516, 18 Sup. Ct. 418. In that case it was argued that equitable jurisdiction to enjoin the action of a state railroad commission from putting into force an order fixing confiscatory railroad freight rates was prevented by the circumstance that the state had furnished a special remedy at law in the state supreme court for the revision of any unreasonable action by the commission. The argument was not successful. Mr. Justice Harlan said:

"One who is entitled to sue in the federal circuit court may invoke its jurisdiction in equity whenever the established principles and rules of equity permit such a suit in that court, and he cannot be deprived of that right by reason of his being allowed to sue at law in a state court on the same cause of action."

In Payne v. Hook, 7 Wall. 425, 430, it was objected to the federal jurisdiction in equity that there was an adequate remedy at law, by a special proceeding in the probate court, but it was held that this was insufficient. We should have no doubt upon this point, were it not for the decision of the supreme court in Ewing v. City of St. Louis, 5 Wall. 418, in which it appears to have been held that a remedy by certiorari in a state court for the review of special state tribunals was ground for holding that the circuit court of the United States had no equitable jurisdiction to enjoin the action of the state tribunal—

"Unless it should become necessary to prevent a multiplicity of suits or irreparable injury, or unless the proceeding sought to be annulled or corrected is valid upon its face, and the alleged invalidity consists in matters to be established by extrinsic evidence. * * * The complainant can ask no greater relief in the courts of the United States than he could obtain were he to resort to the state courts. If in the latter courts equity would afford no relief, neither will it in the former."

It is difficult to reconcile the case, on its facts with Payne v. Hook and Smyth v. Ames, and the statement in the last sentence quoted is certainly not in accordance with the views expressed by the supreme court in many later cases. See In re Tyler, 149 U. S. 164, 13 Sup. Ct. 785; McConihay v. Wright, 121 U. S. 201, 7 Sup. Ct. 940. The language of Ewing v. City of St. Louis has, however, never been cited or commented on, or expressly overruled, by the supreme court. We prefer, therefore, to base the equitable jurisdiction in this case on another ground. It seems clear that the question which is mooted before us could not have been adequately raised upon a proceeding by certiorari. The complaint here made is that the board of equalization did not consider the fact that real and personal property, other than that of railroad companies, was habitually and intentionally assessed at 25 per cent. less than its real value, as a reason for reducing the assessment of railroad property to the same percentage. There was nothing on the record made up by the board to show that the defendants did not exercise this power of equalization, and did not exercise their best judgment to fix the assessment of railroads at 25 per cent. less than their real value. If they ought to have done so, and if there was no direct evidence that they did not, the reviewing court, upon certiorari, would have been bound to presume that they did so, and no extrinsic evidence would have been permissible to rebut this presumption. Shelby Co. v. Railroad Co., 16 Lea, 401, 413, 1 S. W. 32; Ogden City v. Armstrong, 168 U. S. 224, 237, 18 Sup. Ct. 98; 2 Spell. Extr. Rem. § 2030.

Coming now to the merits of the bill, and issues raised by it, we pass without discussion the averment that the railroad assessment law is unconstitutional, because counsel for appellees have expressly declined to argue the point at this hearing.

Another objection to the validity of defendants' action is that they have made an assessment for the year 1897 without lawful authority. The state board of equalizers and tax assessors created by the act of 1895 had made an assessment of the valuation of railroads for the year 1897, and it is contended that this is the valid assess-

ment. The act of 1897 does not expressly annul the assessment of the old board, but we think that such annulment is necessarily implied. By the first section of the act of 1897, the new board of tax assessors was required to meet in May, 1897. By the second section, the railroad, telegraph, and telephone companies were required to file with the comptroller of the state on or before the 1st of May, 1897, and biennially thereafter, schedules and descriptions of their property. Section 4 directs that the state tax assessors shall receive the schedules from the comptroller immediately upon their organization, and "they shall immediately proceed to ascertain the value of said property for taxation." The assessment is required to be completed by the assessors, and filed with the comptroller, on or before September 1st, and by him, within three days, delivered to the board of equalization, consisting of the governor, the treasurer, and the secretary of state, who are required to examine the assessment and records made by the assessors, and complete the same, by affirming or modifying it, before the 3d day of October. The comptroller is then at once to distribute the assessment to the various counties of the state. Section 15 provides that the taxes so assessed shall be a first lien upon the property from the 10th of January of the year for which the taxes are assessed. Section 18 provides that the assessments shall "be made biennially, beginning with the year 1897." It is impossible to escape the conclusion, from these provisions, that the legislature intended that the new system should go into operation at once, and that the new boards should make an assessment for the current year of 1897. Such an intention cannot be reconciled with a continuance in force of the assessment of the old board for that year. Of course, the assessment of real property by the old board still remained valid, though the board was abolished; but as to railroad, telegraph, and telephone property, the act of 1897 was an annulment pro tanto.

The complainant makes a series of objections to the validity of the assessment of defendants, based on the data upon which the assessments were made, and the refusal of the assessors and the defendants to consider certain evidence tendered by the complainant. We do not propose to discuss the objections seriatim. It is sufficient to say that we find nothing in the evidence that was before the two boards which they might not properly consider, under the laws of Tennessee, as circumstances to aid them in reaching a conclusion as to the value of that part of the railroad of complainant lying in Tennessee. Nor do we discover anything in the record to indicate that such evidence was wrongly applied. We do not find anything in the record or affidavits affirmatively showing that the boards have included in their assessments property of the complainant not in Tennessee, and the defendants, in their report of the assessment and in their answer, expressly deny that any such property was included. The exclusion of certain expert evidence to show how unreliable a standard of value are market reports of stocks and bonds we do not regard as material. Even if this were a direct proceeding to review the action of the defendants, as upon error (which it is not), the ruling could hardly be the subject of criticism; for the mat-

ters touched upon in the affidavits were matters of general knowledge, which the defendants and the assessors might be presumed to know. The relevancy of such items of evidence as the market values of bonds and stocks, and the amount of gross earnings and the net earnings, in reaching a conclusion as to the value of a railroad or a telegraph line, has been so often recognized by the supreme court of the United States that we need not discuss it. Railroad Co. v. Backus, 154 U. S. 424, 14 Sup. Ct. 1114; Henderson Bridge Co. v. Kentucky, 166 U. S. 150, 17 Sup. Ct. 532; Adams Express Co. v. Ohio State Auditor, 165 U. S. 194, 17 Sup. Ct. 305; Id., 166 U. S. 185, 17 Sup. Ct. 604. It is contended that the law of Tennessee, as declared by its supreme court, is that each line of railroad must be valued by itself, and not as part of a system, and therefore that the unit theory, upon which the foregoing decisions were based, has no application to Tennessee. If this be true, it only reduces the size of the unit, but it does not destroy the evidential bearing of stock and bond values upon the value of railroad property; and we must presume, in a collateral attack upon the action of the board, such as this is, in the absence of any showing to the contrary, that, within the limits of the reasonable discretion and judgment vested in the defendants, they gave proper consideration to the Tennessee rule, if it differs from the general rule, in weighing and applying the evidence of stock and bond values to the issue before them.

The next objection to the assessment of the defendants, and the most serious, is that they have assessed the railroad property of the state, including that of complainant, at its real value, whereas all other property of the state is habitually and intentionally assessed by the assessing officers, who are not the defendants, at not exceeding 75 per cent. of its real or correct value. We think it clear, from the provisions of the railroad assessment act of 1897, that neither board thereby created is charged with any duty to equalize the taxable value of real estate with that of railroad property. The board of equalization under the act of 1897 is made up of the same state officers who composed the state board of examiners under the prior act, and they were charged with the duty of revising the assessment of railroads made by the board of assessors and equalizers created by the act of 1895; but they had no revisory duty connected with that board's equalization of real estate throughout the state. Hence when, in 1897, the board of assessors and equalizers was abolished, the equalization of real estate values was abolished. The continuation of the state board of examiners under the new name of the "Board of Equalization" could have no effect to continue in force provisions of law as to state equalization of values of real estate, because that board never had any duty connected with the assessment of real estate at all. It is also clear that the act of 1897 commands the two boards created, by its terms, to fix the correct value of the railroad and other property which they assess. This means the real value of the property, and it is conceded that the laws for the assessment of real and personal property impose on the assessing officers the duty of assessing it at the same value.

The contention for the complainant is that the undervaluation of real and personal property is intentional and systematic throughout the state, and is in accordance with an immemorial and well-recognized custom; that, combined with the assessment at full value of all railroad property, the undervaluation of all other property makes a system of taxation operating to impose upon complainant, and all others holding the same class of property, a grossly unjust share of the cost of the state, county, and city governments; that this is in violation of the constitution of the state of Tennessee, which enjoins uniformity of taxation, according to value, on all property, and expressly forbids that one species of property shall be taxed higher than any other; and that a court of equity, because it is unable to remedy the glaring injustice done to complainants and others of the same class, by compelling the assessment on other property to be raised to its real value, may accomplish the same result by enjoining the defendants from assessing railroad property at any higher percentage than that at which other property in the state is assessed, although this is a departure from the rule of action prescribed for them in the statute creating them a taxing board.    In considering the soundness of this contention, we come first to the facts.    We find from the evidence, which is uncontradicted, that generally, in the state of Tennessee, for a number of years, the assessors and the board of equalization of each county have intended to assess, and have assessed, real and personal property at a uniform percentage less than its real value; that this percentage is not uniform between the counties, but that it is not substantially less than 25 per cent. in any of them.    We base our conclusion on 150 affidavits contained in the record.    They do not cover specifically more than 35 counties out of the 96 counties in the state; but when they are supplemented by the evidence of the members of the state board of equalizers, who officially investigated the manner of making assessments in each county in the state by actual visits and by correspondence, by examining the assessing officers, and by a comparison of tax values with actual sales, we have no difficulty in finding the fact to be as above stated.    The affidavits from different counties are many of them the sworn statements of the assessors and county equalizers themselves, who made the assessments, and leave not the slightest doubt that in each county the undervaluation was systematic, was according to a uniform and well-understood rule of reduction, and was for the purpose of reducing the proportionate burden of the expenses of the state government which the particular county would have to bear. These expenses are, in effect, apportioned to each county in the proportion which its total tax valuation bears to the total tax valuation of all the property in the state.    The motive for undervaluation is manifest, and the variation in the percentage, as between the counties, is dependent only on the varying extremes to which taxing officers of different counties are willing to go in departing from the statutory rule to reduce the state burden on their respective counties. We further find that in the year 1897, which is one of the years in respect to which relief is asked in the bill, the assessment of real estate which was not affected by the repeal of the act of 1895 was

equalized by the state board of assessors and equalizers, under that act, at a basis of 75 per cent. of its real value; that this was done intentionally, and was adopted as a rule of action by that board. This is established by the evidence of two of the three members of the board, and of the secretary of the board; and although there is a discrepancy in their statements, as to whether the basis fixed was 70 or 75 per cent. (two of them saying that it was 70, and the other 75), the fact that they deliberately fixed a percentage of real value as their basis of assessment is admitted by all of them. We are relieved from considering the weight of the evidence as to the exact basis by the averment of the bill, which fixes it at 75 per cent. The assessed value of real and personal property, except railroads and telegraph lines, in Tennessee, for the year 1897, was, in round numbers, $312,000,000. The value of railroads and telegraph lines, as assessed by defendants, was $63,000,000,—an increase of the assessed value of the year before of $25,000,000. This makes a total tax value of $375,000,000, and imposes on the railroads $63/375$, or about $1/6$ of the entire burden of the state, county, and municipal governments. If the assessment of the real and personal property were increased to actual value, it would be $416,000,000, and the share of the railroad in paying governmental expenses would be a little less than $1/8$ of the whole. The existence of this glaring inequality no evidence has been introduced to contradict. The defendants have been content to deny it in a general way in their answer, and have adduced no testimony upon the point from any one professing to have specific knowledge on the subject.

The constitution of Tennessee adopted in 1870 (article 2, § 28) provides that:

"All property—real, personal and mixed—shall be taxed. * * * All property shall be taxed according to its value, that value to be ascertained in such manner as the legislature shall direct, so that taxes shall be equal and uniform throughout the state. No one species of property from which a tax may be collected shall be taxed higher than any other species of property of the same value."

The constitution of 1834, in article 2, § 28, provided that:

"All property shall be taxed according to its value, that value to be ascertained in such manner as the legislature shall direct, so that the same shall be equal and uniform throughout the state. No one species of property, from which a tax may be collected, shall be taxed higher than any other species of property of the same value."

The constitution of 1796 provided that:

"All lands liable to taxation in this state, held by deed, grant, or entry, shall be taxed equally and uniform, in such manner that no 100 acres shall be taxed higher than another, except town lots, which shall not be taxed higher than 200 acres of land each; no freeman shall be taxed higher than 100 acres, and no slave higher than 200 acres on each poll."

In Reelfoot Lake Levee Dist. v. Dawson, 97 Tenn. 151, 161, 36 S. W. 1041, 1043, the supreme court of Tennessee, referring to these provisions, said:

"In every instance the requirement that all property (except that mentioned for exemption) shall be taxed prohibits the legislature from making additional exemptions. * * * And likewise the requirement that all prop-

erty shall be taxed according to its value prohibits the legislature from laying a tax on any property in specie, or by the acre. Under the constitution of 1796, lands were taxed by the hundred acres; but the constitution of 1834, like that of 1870, contained the provision that 'all property shall be taxed according to its value.' This means that every property tax shall be graduated by the value of the property on which it is laid." *

There has been much discussion at the bar upon the point whether the constitution of 1870 requires that all property shall be assessed at its full value, or whether it would satisfy the constitution if the taxing laws required all property to be assessed for taxation at a uniform percentage,—say 75 per cent. of its real value. Language has been quoted from the opinions of judges of the supreme court of Tennessee supporting the former view, but they were obiter, and wholly unnecessary to the decision of the cases before the court. Mayor, etc., of Chattanooga v. Nashville, C. & St. L. R. Co., 7 Lea, 569; Brown v. Greer, 3 Head, 696. Speaking for Judge LURTON and myself, we should be inclined to hold that any legislative system of tax assessment of property based on a uniform percentage of its value would be "according to its value," and would be a compliance with the constitutional mandate. This is, we think, in accordance with the latest expression from the supreme court of Tennessee in the Reelfoot Lake Levee District Case, already quoted. Judge SEVERENS doubts, and the difference is not material, for we are unanimously of opinion that the question is not controlling in this case. The constitution expressly gives the legislature the power to prescribe that all property shall be assessed at its true value, and the legislature has done so. Such a legislative command is as binding on those whom it affects as if it were in the constitution, because passed in pursuance of the fundamental law; and counsel for complainant do not avoid the difficulty which confronts them in the case, to wit, that they are seeking to enjoin defendants from doing that which the letter of the law requires the defendants to do, by showing that the requirement is in a constitutionally enacted statute, rather than in the constitution itself.

The sole and manifest purpose of the constitution was to secure uniformity and equality of burden upon all the property in the state. As a means of doing so (conceding that defendant's construction is the correct one), it provided that the assessment should be according to its true value. It emphasized the object of the section by expressly providing that no species of property should be taxed higher than any other species. We have before us a case in which the complaining taxpayer, and other taxpayers owning the same species of property, are taxed at a higher rate than the owners of other species of property. This does not come about by legislative discrimination, but by the intentional and systematic disregard of the law by those charged with the duty of assessing all other species of property than that owned by complainant and its fellows of the same class. This is a flagrant violation of the clause of the constitution forbidding discrimination in taxation between different species of property. That clause is self-executing. Reelfoot Lake Levee Dist. v. Dawson, 97 Tenn. 160, 36 S. W. 1043. How is it to be remedied? It is said on behalf of the defendants that the

only method consistent with the constitution is by raising the assessments of the real and personal property. This is no remedy at all. It has been suggested (but we cannot regard the suggestion as a serious one) that the railroad companies of the state should go before the taxing authorities of each county, and, after notifying each taxpayer, attempt to secure an increase in the total tax assessment of the real and personal property of the state from $312,000,000 to $416,000,000. The absolute futility of such a course, the enormous expense, and the length of time necessary in attempting to follow it, need no comment. The question presented is, then, whether, when the sole object of an article of the constitution is being flagrantly defeated, to the gross pecuniary injury of a class of litigants, and one of them appeals to a court of equity for relief, it must be withheld because the only mode of granting it will involve an apparent departure from the method marked out by the constitution and the law for attaining its sole object. We say "apparent" departure from the constitutional method, because that instrument contemplated a system in which all property should be assessed at its real value. It did not intend that a large part should be assessed at 75 per cent., and a smaller part at 100 per cent. The method of assessing one species of property cannot be truly said to be constitutional, without having regard to that pursued with other species; for the essence of the constitutional requirement is uniformity, and uniformity cannot be affirmed to exist without a due regard to the methods of assessing all species. Therefore, to enjoin the enforcement of the prescribed method of assessment as to one species of property, when there is a departure from it as to all others, if the injunction secures uniformity as to all, is not so great a violation of the method really prescribed as that involved in a continuance of the existing conditions, and the denial of relief to the injured taxpayer. The court is placed in a dilemma, from which it can only escape by taking that path which, while it involves a nominal departure from the letter of the law, does injury to no one, and secures that uniformity of tax burden which was the sole end of the constitution. To hold otherwise is to make the restrictions of the constitution instruments for defeating the very purpose they were intended to subserve. It is to stick in the bark, and to be blind to the substance of things. It is to sacrifice justice to its incident. The same dilemma has been presented to other courts. They have not always taken the same horn. There is a conflict of authority, but we are glad to say that the adjudications of that court whose decision we must follow support the views we have above expressed. Before examining the cases in the supreme court of the United States, let us refer to the decisions of some of the state courts upon the question:

In Randell v. City of Bridgeport, 63 Conn. 321, 28 Atl. 523, the case came into court on a direct appeal from the action of a board of equalization, called the "Board of Relief of the City of Bridgeport." The superior court found as a fact that it had been the uniform rule of the board of assessors and the board of relief of that city to value all property, for the purpose of taxation, at one-half of its fair market value. The court found that the plaintiff's prop-

erty was assessed at its full market value as the statute required.
The supreme court held that the complainant was entitled to an
assessment of one-half the real value of his property, and this in
the face of a mandatory provision of the statute that all property
should be assessed at its true value.   The court said:

"There are two ways in which a taxpayer may be wronged in levying
taxes:   An assessment may conform to the statute generally, and the in-
dividual may be assessed in excess of the statutory requirement.  A wrong
of that description is easily redressed.   But when the town disregards
the statute, and establishes a rule of its own, assessing the property at one-
half of its actual value, and then assesses an individual at the full value of
the property, while the injury is the same, the application of the remedy
becomes more complicated.   Practically, the only way to redress the wrong
is to reduce the assessment, and that makes the court seem to disregard the
statute, while, if the wrong is not redressed, there is a denial of justice, and
the court practically ignores the statute giving an aggrieved party an appeal,
and practically ignores the statute which provides that 'said court shall have
power to grant such relief as shall to justice and equity appertain.'  Thus we
are in a dilemma.   If we choose one horn of it, a public statute is violated,
not so much by the court as by the town, but by an apparent approval of
the court as to one individual, and that by an express command of another
statute, and by the dictates of justice.   If we take the other horn, the court
itself violates a remedial statute, and becomes in a measure a party to the
wrongdoing.   Under the circumstances, we do not hesitate to choose the
former, and to redress the wrong."

This, it is true, was a direct review of the action of the board of
equalizers; but the court, in reaching its conclusion, expressly pro-
ceeded under the power given it by statute to grant such relief as to
justice and equity should appertain.   This court is entitled to grant
to the complainant exactly the same character of relief.   As already
pointed out, the fact that the injunction to assess property at its
true value is found in the statute, and not in the constitution, cannot
create any distinction in respect to the point we are now discussing,
for either is equally binding on the taxing officers and the courts.
Courts have no more right to set aside a lawfully enacted statute
than they have to defeat the operation of the constitution.   The
point of this case, and those about to be cited, is that where either
the uniformity required by law, or the prescribed means of attain-
ing it, must be departed from, the court will choose the lesser evil.

In Cocheco Co. v. Strafford, 51 N. H. 455, the law provided that
the selectmen should appraise all taxable property at its full and true
value in money.   The statute further provided that the court should
make such order thereon as justice required.   Mr. Justice Doe, upon
this point, in a concurring opinion, said:

"Justice requires an equal rate of taxation of Strafford real estate.  If the
Strafford real estate of others was appraised in 1870 at a less rate than its
full value, the real estate of the plaintiffs should be appraised by the commis-
sioners at the same rate, so that the plaintiffs shall pay their proportion of
tax and no more.   The usual rate in farming towns is well understood, and
the practice of undervaluation is so universal as to raise a presumption of
fact that it prevails in Strafford.   When the commissioners have ascertained
the fact of the full value of the plaintiffs' Strafford real estate on the 1st day
of April, 1870, they should proceed further, and appraise it at its value as
compared with the value at which other Strafford real estate was appraised
by the selectmen in 1870.   This comparative value is the only question which
the commissioners are appointed to decide, and is a pure question of fact."

This language was approved in Manchester Mills v. Manchester, 58 N. H. 38, on a petition for the abatement of the real-estate tax, in which the court appointed a committee to find and report— First, the true value of the plaintiff's estate; and, second, the true value of real estate of Manchester, other than plaintiff's, compared with its assessed value. The question whether the second point was a proper subject for inquiry came before the court, and it was held that it was a proper subject of inquiry, and that the abatement should proceed on the findings made upon such inquiry.

In Ex parte Ft. Smith & Van Buren Bridge Co., 62 Ark. 461, 36 S. W. 1060, the case arose on an appeal from the refusal of the county board of equalization to reduce the taxation of assessment upon the petitioner's bridge. The assessor had assessed one-half of the bridge in Crawford county at $150,000, and the county board of equalization had reduced this assessment to $125,000. At the trial in the circuit court it appeared that $250,000 was a fair market price for the entire bridge, and that $125,000, therefore, was the full value of one-half of the bridge. It further appeared that all the real estate in Crawford county was assessed at 50 per cent. of its actual value. The appellate court contended that, under the circumstances, the assessment of one-half the bridge should be reduced according to its request to $75,000. The constitution of the state was exactly in the words of the Tennessee constitution, to wit:

"That all property subject to taxation shall be taxed according to its value, to be ascertained in such manner as the general assembly shall direct, making the same equal and uniform throughout the state, and provided further that no one species of property, upon which taxes shall be levied, shall be taxed higher than another species of property of equal value."

The law passed in pursuance of this section of the constitution required the assessors of the counties in the state to assess the real estate at its true market value in money. The court, in construing this question, said:

"It may be said that, inasmuch as its property was not assessed above its true value, it had no right to complain. But this is not true. It had the right to demand that no unequal burden be imposed upon it by taxation. The duty to contribute to the support of the state government by the payment of taxes is imposed upon all persons owning property subject to taxation. The constitution provides that this burden shall be apportioned among them according to the value of their property, to be ascertained as directed by law. When, therefore, the property of a few is taxed according to its value, and of all others at one-half its value, then the few are required to contribute double their portion of the burden. This is manifestly a wrong, and justice demands that it be redressed whenever it can be done conformably to the laws. * * * In this case the county court acquired jurisdiction, by the appeal of the bridge company, to grant relief from the illegal, erroneous, or unequal assessment of appellant's property, but did not acquire the right or authority to make the valuation of all real property in the county for the purposes of taxation, in all cases in which it had not been done, the true value, by raising it, or to change the valuation of any property except the bridge. The assessment of no property can be increased without notice first given to the owner by the board of equalization. How, then, was the county court to afford relief to appellant? The only relief it could have afforded was to reduce the valuation so as to make it conform to the standard adopted in the valuation of the other real property in the county, or the average valuation of such property. Why should not this relief be granted? The valuation of property is only

a constitutional means adopted for the purpose of making the burdens of government bear upon each taxpayer in proportion to the value of his property. The relief suggested accomplishes that end in this case. By granting it, a constitutional right will be enforced, and by denying it, will be withheld, because the means devised for its enforcement were not adopted. By pursuing the latter course, the constitution will be made the means of defeating itself, by the imposition of unequal burdens. To avoid this result, the relief should be granted."

In the case of Board of Sup'rs of Bureau Co. v. Chicago, B. & Q. R. Co., 44 Ill. 229, the appeal was a direct appeal from the board of supervisors, which assessed the value of the property of the railroad company. It appeared that the valuation of property of individuals, except that of the railroad company ranged from one-fifth to one-third, while that of the railroad company ranged from one-third to one-half; and the appellate court decided that the assessment of the railroad property must be at the same percentage of the real value as that of individuals. The constitution of Illinois required the general assembly to provide for levying a tax by valuation, so that 'every person and corporation shall pay a tax in proportion to the value of his or her property; such value to be ascertained by some person or persons to be elected or appointed in such manner as the general assembly shall direct, and not otherwise. The act to carry out this section provided that each separate parcel should be valued at its true value in money. The court held that it was the duty of the supervisors to impose the same percentage of assessment upon the railroad company as had been assessed by the assessors upon the property of individuals. The court said:

"It is no argument to urge that the fault is with the assessors in the case of individuals, and with railroad companies in making out their schedules for the county clerk. If the assessors violate their duty, are railroad companies to be the sufferers? If they neglect to act fully up to all the requirements of the law, is that any reason why A. should pay forty per cent. more taxes, in proportion to value, than B.? The rule adopted by the assessors in this state has grown into a custom, and has been tacitly sanctioned by every department of the government for a long course of years, and it is now too late to challenge it. * * * Would not the sense of justice of every man in this community be outraged by allowing this or any other depreciation to one class of people, and demanding of another a higher tax on a similar article of the same actual value? The proposition cannot commend itself to the favor of any just man, and can receive no countenance in a court of justice. It is an admitted fact on both sides to this controversy that the property of no one owner in the county of Bureau has been taxed on its real value, and that the per cent. added by the board of supervisors to the valuation of the property of appellees imposes on them a greater proportionate burden than the law requires them to bear. We are of this opinion, and therefore consider the action of the board unfounded in justice, and in direct opposition to the constitution. The great and attractive feature of uniformity has been disregarded by the board, and appellees victimized. It may be very desirable that the greatest share of the public burdens shall be borne by these corporations, but, until there be a radical change in our fundamental law, it cannot be done. They stand on the platform of equality before the law, and no greater burden for the support of government can be imposed upon them than can be placed on the individual taxpayer."

In the case of Chicago, B. & Q. R. Co. v. Board of Com'rs of Atchison Co., 54 Kan. 781, 39 Pac. 1039, the railroad company filed a bill in equity to enjoin the collection of 75 per cent. of its taxes

levied against it in Atchison county. The railroad was assessed by a state board of railroad assessors, who assessed the road at its true and actual value. In the county of Atchison all the city and township assessors, for the purpose of carrying on an equal basis the assessment, agreed among themselves to assess all property 25 per cent. of the true value of the same. The railroad property was thereupon assessed at the true value, while the property of individuals and other corporations in Atchison county was assessed at 25 per cent. of its real value. The constitution of the state required that the legislature should provide for a uniform and equal rate of assessment and taxation. The legislature provided that all property should be assessed at its true value. The court said:

"This unequal valuation was not the result of an accidental omission of property from the assessment list, or an accidental valuation of property at more or less than its true value. The state board of railroad assessors valued the railroad property in Atchison county, for taxation, at its true value; but the city and township assessors of that county, by an agreement between themselves, assessed all the other property of the county at 25 per cent. of its true value. Thus, by concerted action, the statute of the state was flagrantly disregarded. * * * There has been gross discrimination in the taxation of the railroad property. The law has not been observed. The taxes complained of are not equal and uniform. While exact equality and uniformity cannot be had, and while mistakes and omissions by assessors may not in all cases be the subject of adequate remedy in the courts, yet for the gross injustice and violation of the law complained of there ought to be some remedy. The plaintiff below, having tendered all of the state taxes, and also its just share of the county and other taxes, is entitled to have enjoined the collection of the illegal excess."

As has already been said, there are cases in which the other horn of the dilemma has been taken, the injustice to the complaining class of taxpayers has been allowed to continue, and the violation of constitutional or statutory uniformity and equality has gone on unhindered, in order that the letter of the law may be preserved while its spirit is flagrantly broken. Wagoner v. Loomis, 37 Ohio St. 571; Central R. Co. v. State Board of Assessors, 48 N. J. Law, 1, 2 Atl. 789. See, also, City of Lowell v. County Com'rs, 152 Mass. 372, 25 N. E. 469.

We are relieved from a further discussion of the question by the decision of the supreme court of the United States in the case of Cummings v. Bank, 101 U. S. 153. In that case the assessors of real property, the assessors of personal property, and the county auditor (who was the assessing officer of the first instance for bank shares) of the county where the complainant bank was situated agreed to assess real and personal property at one-third its value, and money or invested capital at six-tenths its value. This agreement was in violation of the statutes under which they were acting, which required assessments to be at the true value in money. The state board of equalization for banks increased the assessment of complainant's bank shares to their full market value. The state board had no power to equalize bank shares with real or personal property, and, in assessing these bank shares at their full value, it was following the exact course prescribed by statute, and the statute was passed in accordance with the constitution of Ohio, which requires

the legislature to pass laws taxing all property "by uniform rule at its true value in money." This action was brought by the complainant bank to enjoin the county treasurer from collecting the tax on the assessment against its shares which had been certified down by the state board of assessors. The circuit court of the United States enjoined the treasurer from collecting tax on a valuation greater than one-third of the real value of the shares. The effect of this order was to annul an assessment by the state board of equalization which was strictly in accordance with the letter of the statute governing it in the discharge of its duties, and which was equally in accord with the standard of value for assessment fixed by the constitution of the state. The decree of the circuit court was affirmed by the supreme court on the principle stated by the court as follows:

"When a rule or system of valuation is adopted, by those whose duty it is to make the assessment, which is designed to operate unequally, and to violate a fundamental principle of the constitution, and when the rule is applied, not solely to one individual, but to a large class of individuals or corporations, that equity may properly interfere to restrain the operation of this unconstitutional exercise of power."

It should be noted that, although the complainant was a national bank, the case did not arise under the act of congress, but was expressly based on the right of the complainant, under the state constitution, to uniformity of taxation according to value. The taxing laws of Ohio did not provide one tribunal of appeal for equalizing values of all classes of property, and it was objected on behalf of the bank that, in view of the constitutional injunction upon the legislature to pass laws taxing all property by uniform rule at its true value in money, a system in which different classes of property were assessed by independent tribunals, with no common revisory authority, must be invalid, because so poorly adapted to secure uniformity. The court did not yield to this argument, however. Mr. Justice Miller, delivering the opinion of the court, gave its reasons for not doing so as follows:

"But there are two reasons why we cannot so hold: First, it might be that in every instance the result would be the valuation of bank shares at a lower ratio in proportion to their real value than that of any other property, and therefore plaintiff would have no ground of complaint. And, secondly, what is more important, if these original valuations and equalizations are based always, as the constitution requires, on the actual money value of the property assessed, the result, except as it might be affected by honest mistakes of judgment, would necessarily be equality and uniformity, so far as it is attainable. So that while it may be true that this system of submitting the different kinds of property subject to taxation to different boards of assessors and equalizers, with no common superior to secure uniformity of the whole, may give opportunity for maladministration of the law, and violation of the principle of uniformity of taxation and equality of burden, that is not the necessary result of these laws, or of any one of them; and a law cannot be held unconstitutional because, while its just interpretation is consistent with the constitution, it is unfaithfully administered by those who are charged with its execution. Their doings may be unlawful, while the statute is valid. The evidence, we are compelled to say, shows this to be true of the case before us."

The justice then discussed the facts, to show that the laws had been unfaithfully administered by those charged with their execu-

tion, and that as the only method provided in the system by which constitutional uniformity was to be secured, namely, by taxing all property at its true value in money, though required by statute, had been departed from by the administrators of the law in assessing other classes of property than that held by the complainant, equity might relieve complainant from his unequal burden thus placed on him by enjoining taxation on more than one-third of the assessment against him, though his property had been only taxed at its true value. After commenting on the widespread custom or rule in many states to undervalue real estate, growing out of the effort of the landowner to produce something like equality of burden with personal property which escapes taxation by being hidden, the justice concluded:

"But, whatever may be its cause, when it is recognized as the source of manifest injustice to a large class of property, around which the constitution of the state has thrown the protection of uniformity of taxation and equality of burden, the rule must be held void, and the injustice produced under it must be remedied, so far as the judicial power can give remedy."

The case before us cannot in any material respect be distinguished from the Cummings Case. In this case, as in that, the injunction sought is against the enforcement of an assessment upon complainant's property which was made at the true value of the property, in accordance with the mandate of the constitution and statute, by assessing officers who had not themselves discriminated against complainant's property by undervaluing other species of property, and who were not themselves guilty of any fraud. In this case, as in that, the unjust operation of the assessment grows out of the systematic and intentional undervaluation of other species of property by assessors who are not responsible for the assessment complained of. In this case, as in that, the effect of the injunction is to compel certain assessors of the state to reduce their assessment to the illegal standard of valuation adopted by different and unfaithful assessors of other species of property, and is justified by the result that in this way is secured something like the uniformity which is the sole purpose of the constitution. It has been pressed upon us that no such preconcert of action by the assessing officers, and no such uniform rule of undervaluation, have been shown in this case as appeared in the Cummings Case, and that upon these circumstances the Cummings Case turned. We have already found, from the evidence, that there is an intentional undervaluation of property in each county, and that this is uniform as to all real and personal property, and results from a clear understanding between the assessors and county boards of equalization, who have a common motive for the reduction. More than this, it is clearly shown that the state board of assessors and equalizers in 1896 intentionally equalized all real estate in the state at 75 per cent. of its true value for the taxation of the year 1897. Could preconcert be clearer than this? It is further said that, before the remedy pursued in the Cummings Case can become applicable, it must appear that the undervaluation of one species of property was adopted as a rule of action by the assessors for the fraudulent purpose of discriminating

against the complaining taxpayer and his class, and that no such case is presented to this court. Now, it is true that, before equity will relieve in such a case, it must appear that the assessing officers whose acts of undervaluation create the unjust burden must intentionally and habitually violate the law, by assessing property at a less valuation than that which they know to be its true value; but it is not true that they must be shown affirmatively to intend to injure complainant and his class of taxpayers in so doing. It is true that in the Cummings Case the unfaithful assessors, or some of them, did undervalue both real and personal property, and money capital, in which were included bank shares, at different percentages of their true value; but the assessment of which complaint was made was not the work of these assessors at all, but, as here, of a state board of equalization. An intentional undervaluation of a large class of property, when the law enjoins assessment at true value, is necessarily designed to operate unequally upon other classes of property to be assessed by other taxing tribunals, who, it may be presumed, will conform to the law. In the case at bar the county assessors and board of equalization of each county have been actuated in their violations of the law by the desire to reduce, as far as may be, their county's share of the state burdens. Their undervaluations of property have been uniform as to all property in their county but railroads. They could not but know that such undervaluation must work an injustice against the property of railroads, if assessed at its true value by a state board, and taxed for county and state purposes on that basis. In this sense, the rule of undervaluations adopted in each county is necessarily "designed to operate unequally," within the meaning of Mr. Justice Miller in the Cummings Case. The ratio decidendi of that case is to be gathered from the facts, and the language of the opinion is to be interpreted in the view of the facts. The case has been commented on by the supreme court in a number of subsequent cases, but it has never been modified or overruled.

Bank v. Kimball, 103 U. S. 732, was a bill to enjoin the collection of taxes. The bill was dismissed on demurrer. The bill averred, in effect, that complainant's bank shares were assessed at less than their value, by 50 per cent., but that other property was assessed at less even than this, and that for this reason no tax should be paid on the bank shares. Referring to the Cummings and other cases, Mr. Justice Miller, who spoke for the court, said:

"It is held in these cases that, when the inequality of valuation is the result of a statute of the state designed to discriminate injuriously against any class of persons or any species of property, a court of equity will give appropriate relief, and also where, though the law itself is unobjectionable, the officers who are appointed to make assessments combine together, and establish a rule or principle of valuation, the necessary result of which is to tax one species of property higher than others, and higher than the average rate, the court will also give relief. But the bill before us alleges no such agreement or common action of assessors, and no general rule or discriminating rate adopted by a single assessor, but relies on the numerous instances of partial and unequal valuations, which establish no rule on the subject."

In Supervisors v. Stanley, 105 U. S. 305, the averment of the petition of a national bank seeking to recover taxes claimed to have

been illegally paid was that the assessment of its shares was at a greater rate than was assessed upon other moneyed capital in the hands of individual citizens of the state of New York. In granting a right to amend and have a new trial, Mr. Justice Miller, speaking for the court, said:

"If by this it is supposed that a few individual instances may be shown of partial assessments favoring citizens, as compared with the national banks, we think it is erroneous. But if it is intended to allege that, apart from the question of the right of the shareholder to deduct for his debts,—a question which in this case was disposed of, and was in issue,—it can be proved that the assessors habitually and intentionally, or by some rule prescribed by themselves or by some one whom they were bound to obey, assessed the shares of the national banks higher, in proportion to their actual value, than other moneyed capital generally, then there is ground for recovery, and a hearing as to that should be granted."

In Stanley v. Supervisors, 121 U. S. 550, 7 Sup. Ct. 1239, Mr. Justice Field said:

"When the overvaluation of property has arisen from the adoption of a rule of appraisement which conflicts with a constitutional or statutory direction, and operates unequally, not merely on a single individual, but on a large class of individuals or corporations, a party aggrieved may resort to a court of equity to restrain the exaction of the excess, upon payment or tender of what is admitted to be due. This was the course pursued and approved in Cummings v. Bank, 101 U. S. 153."

In Bank v. Perea, 147 U. S. 87, 13 Sup. Ct. 194, the law of New Mexico required property to be assessed at its cash value. The plaintiff's property was originally assessed at its full value, while the other property was assessed at 70 per cent. It appealed to the board of equalization, which reduced the assessment to 85 per cent. Mr. Justice Brewer said:

"Surely, upon the mere fact that other property happened to be assessed at thirty per cent. below the value, when this did not come from any design or systematic effort on the part of the county officials, and when the plaintiff has had a hearing as to the correct valuation on appeal before the board of equalization, the proper tribunal for review, it cannot be that it can come into a court of equity for an injunction, or have that decision of the board of equalization reviewed in this collateral way."

We find nothing in these cases which should change our view, already expressed, of the effect of the Cummings Case. They merely emphasize the point that equity will not relieve against an assessment merely because it happens to be at a higher rate than that of other property; that such inequalities, due to mistake, to the fallibility of human judgment, or to other accidental causes, must be borne, for the reason that absolute uniformity cannot be obtained; that, in other words, what may be called "sporadic cases of discrimination" cannot be remedied by the chancellor. He can only interfere when it is made clear that there is, with respect to certain species of property, systematic, intentional, and unlawful undervaluations for taxation by the taxing officers, which necessarily effect an unjust discrimination against the species of property of which the complainant is an owner. The reason for the distinction is obvious. The occasional and accidental discriminations are inevitable in every assessment, and are not likely to continue, because not the

result of an illegal purpose on the part of any one. If equitable in-- terference in such cases could be invoked, the obstruction to the collection of taxes would be so frequent as to be intolerable. More than this, an action to enjoin a tax is a collateral attack upon the judgment of a quasi judicial tribunal; and it cannot be justified except on the ground of an obvious violation of law, or something equivalent to fraud. It does not lie where the injury complained of arises only from the erroneous, but honest, judgment of the lawfully constituted tax tribunal. The interference by the chancellor in the case at bar and in the Cummings Case rests on something equivalent to fraud in the tribunal imposing the tax. The various boards whose united action is by law intended to effect a uniform assessment on all classes of property are to be regarded as one tribunal, and the whole assessment on all classes of property is to be regarded as one judgment.' If any board which is an essential part of the taxing system intentionally, and therefore fraudulently, violates the law, by uniformly undervaluing certain classes of property, the assessment by other boards of other classes of property at the full value, though a literal compliance with the law, makes the whole assessment, considered as one judgment, a fraud upon the fully-assessed property. And this is true although the particular board assessing the complainant's property may have been wholly free from fault of fraud or intentional discrimination. Therefore the injunction might issue against the assessment upon the fully-assessed property, as void altogether, until a new and uniform assessment upon all property according to law could be made. And such is the rule in some courts. Weeks v. Milwaukee, 10 Wis. 263; Hersey v. Board, 16 Wis. 192; Smith v. Smith, 19 Wis. 619. The inequity of allowing the taxpayer to escape altogether, and the intolerable inconvenience to the public in the delay incident to such a course, however, lead a court of equity to shape its order so as to allow only so much of the fraudulent judgment to be enforced against the complainant as may be done without imposing on him any inequality of tax burden. We reach the conclusion, therefore, that the circuit court was right in enjoining the unjust, unequal, and (in the sense already explained) fraudulent assessment against the complainant; but we think the order should have required, as a condition of the issuing of the injunction, that the complainant should pay to the proper officers a tax upon the 75 per cent. of the assessment made by defendants. The evidence, taken with the averments of the bill, does not establish that the discrimination against the complainant's property really exceeds this. The condition imposed by the circuit court was the payment of the taxes on the assessment for 1897 by the state board of assessors and equalizers. That assessment, as we have found, was annulled by the act of 1897. The order of the court is that the order of injunction be modified as above stated, and that, as thus modified, it be affirmed, at the costs of the appellants.